FILED
United States Court of Appeals
Tenth Circuit

February 2, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

TREVOR D. STEWART; TODD
PHILLIPS; JOE PHILLIPS; H. DELL
LEFEVRE, individually and in his
capacity as member of the Board of
County Commissioners of Garfield
County; WORTH W. BROWN;
JAMES N. BROWN; WILLIAM F.
ALLEMAN; BOARD OF COUNTY
COMMISSIONERS OF KANE
COUNTY, UTAH, a political
subdivision of the State of Utah;
BOARD OF COUNTY
COMMISSIONERS OF GARFIELD
COUNTY, UTAH, a political
subdivision
of the State of Utah; D. MALOY
DODDS, in his official capacity as
member of the Board of County
Commissioners of Garfield County;
MARK HABBESHAW, in his official
capacity as member of the Board of
County Commissioners of Kane
County; DANIEL HULET, in his
official capacity as member of the
Board of County Commissioners of
Kane County; CLARE RAMSAY, in
her official capacity as member of the
Board of County Commissioners of
Garfield County; RAY SPENCER, in
his official capacity as member of the
Board of County Commissioners of
Kane County,

      Plaintiffs - Appellants,

No. 08-4020

v.

DIRK KEMPTHORNE, in his capacity as Secretary of the United States Department of the Interior; THE UNITED STATES DEPARTMENT OF THE INTERIOR; THE BUREAU OF LAND MANAGEMENT, an agency of the Department of the Interior of the United States; DAVID WOLFE, Acting Manager, Grand Staircase Escalante National Monument,

  Defendants - Appellees,

CANYONLANDS GRAZING CORPORATION; GRAND CANYON TRUST,

  Defendants-Intervenors - Appellees,

------------------------

CATRON COUNTY, NEW MEXICO; COALITION OF ARIZONA/NEW MEXICO COUNTIES FOR STABLE ECONOMIC GROWTH; NEW MEXICO CATTLE GROWERS' ASSOCIATION; OTERO COUNTY, NEW MEXICO; UTAH ASSOCIATION OF COUNTIES,

  Amici Curiae.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:06-CV-00209-TC)**

Brandon Jensen (Karen Budd-Falen of Budd-Falen Law Offices, L.L.C., on the briefs), Cheyenne, Wyoming, for Plaintiffs - Appellants.

Jared Bennett, Assistant United States Attorney (Brett L. Tolman, United States Attorney, on the brief), Salt Lake City, Utah, for Defendants - Appellees.

W. Cullen Battle of Fabian & Clendenin, Salt Lake City, Utah, for Defendants-Intervenors - Appellees.

J. Mark Ward of Utah Association of Counties, Murray, Utah, for Amicus Curiae Utah Association of Counties.

Murray D. Feldman of Holland & Hart, L.L.P., Boise, Idaho; Susan L. Lyndrup, Holland & Hart, L.L.P., Jackson, Wyoming, for Amici Curiae Arizona and New Mexico Counties for Stable Economic Growth; Catron County, New Mexico; Otero County, New Mexico; and New Mexico Cattle Growers' Association.

Before **HENRY**, Chief Judge, **KELLY**, and **MURPHY**, Circuit Judges.

**KELLY**, Circuit Judge.

Plaintiffs-Appellants, comprising individuals and two Utah counties, appeal from the denial of grazing permit applications for three allotments within the Grand Staircase-Escalante National Monument.  The district court upheld an administrative law judge's determination that the Bureau of Land Management (BLM) properly rejected the individual applications because a valid grazing permit had already been issued to Canyonlands Grazing Corporation.  Plaintiffs also appeal the district court's determination that Kane and Garfield Counties lack standing.  Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

Background

A. The Taylor Grazing Act

By way of background, in 1934, Congress enacted the Taylor Grazing Act (TGA) providing a comprehensive plan to administer, improve, and develop the grazing lands of the United States. 43 U.S.C. §§ 315-315r. The legislation vested broad authority in the United States Secretary of the Interior (the Secretary) to issue grazing permits to "bona fide settlers, residents, and other stock owners as under his rules and regulations are entitled to participate in the use of the range . . . ." 43 U.S.C. § 315b. The TGA implementing regulations further define the requirements for issuing grazing permits. To receive a grazing permit, an applicant must (1) own or control land or water base property, and (2) either meet United States citizenship requirements, or be an entity authorized to conduct business in the state in which grazing is intended. 43 C.F.R. § 4110.1(a). Each grazing permit specifies the grazing preference, the terms and conditions, and the duration of the permit. Grazing preferences refer to the total number of animal unit months (AUM) allocated to base property owners, and give holders priority over others seeking grazing permits. 43 C.F.R. § 4100.0-5 (grazing preference definition). The grazing preferences are attached to the base property, see 43 C.F.R. § 4110.2-2(c), and are transferable, see 43 C.F.R. § 4110.2-3. Once the transfer is approved, the preference applies to the transferee's base property—if another entity applies for a grazing preference on the allotment upon

- 4 -

which the transferee holds a preference, the transferee's grazing application prevails.  See 43 C.F.R. § 4100.0-5 (grazing preference definition) ("Grazing preference holders have a superior or priority position against others for the purpose of receiving a grazing permit or lease.").  See generally Pub. Lands Council v. Babbitt, 528 U.S. 728, 739-40 (2000).  The BLM is responsible for the administration and issuance of grazing permits.

B.  The Allotments

 Within the Grand Staircase-Escalante National Monument are three allotments established by the United States Department of the Interior as lands designated for livestock grazing.  This appeal arises from a dispute as to who is the proper grazing permit holder for these allotments.

1.  Clark Bench Allotment

On June 29, 2000, Intervenors Grand Canyon Trust and Canyonlands Grazing Corporation (collectively Canyonlands) entered into an agreement with Brent Robinson, the then existing permit holder for the Clark Bench allotment, that he would either relinquish his grazing preference and permit to the BLM, or alternatively transfer his preference to Canyonlands, in exchange for compensation.  Aplt. App. 829-31.  Following a proposal by Canyonlands to relinquish grazing rights voluntarily on the Clark Bench allotment, the BLM initiated an environmental assessment of that allotment.  Aplt. App. 1331; see also Stewart v. Kempthorne, 2:06CV209 TC, 2008 WL 80252, at *1 (D. Utah Jan.

7, 2008); see also Aplt. App. 300, 404-05 (testimony of Mr. Willard Hedden representing Canyonlands) (referencing agreement between the BLM and Canyonlands to submit offers of relinquishment and noting that conditions applied to the agreement).

On November 30, 2001, the BLM issued notice in the Federal Register that it intended to begin an environmental assessment of the Clark Bench allotment to determine whether it was appropriate to retire grazing on that land if Canyonlands voluntarily relinquished its AUMs to the BLM. Notice of Intent to Amend Plan for the Grand Staircase-Escalante National Monuments, 66 Fed. Reg. 59,812, (Nov. 30, 2001); Aplt. App. 844-78. On April 15, 2002, Canyonlands sent a letter to the BLM formally withdrawing its offer to relinquish its grazing preference in response to the BLM's requirement that it do so prior to initiating a land-use plan amendment process. Aplt. App. 1092-93. The BLM acknowledged this withdrawal on May 24, 2002. Stewart, 2008 WL 80252, at *3. Canyonlands filed its grazing application with the BLM on January 29, 2003. Aplt. App. 1101-09. Finally, on March 6, 2003, the BLM issued a grazing permit for the Clark Bench allotment to Canyonlands. Aplt. App. 1117.

Meanwhile, Plaintiffs Trevor Stewart, Worth Brown, James Brown, and William Alleman sought individual grazing permits on the Clark Bench allotment, and filed their respective applications with the BLM. Aplt. App. 884-89 (Mr. Trevor Stewart filed on January 22, 2002); Aplt. App. 1121-22 (Mr. Worth Brown

- 6 -

filed on March 18, 2003); Aplt. App. 1123-24 (Mr. James Brown filed on April 7, 2003); Aplt. App. 1126-27 (Mr. William Alleman filed on May 19, 2003). On September 26, 2003, the BLM denied Mr. Stewart's grazing application because Canyonlands held the permit pursuant to its preference for the allotment, and no additional livestock forage was available on the Clark Bench Allotment. Aplt. App. 1128-30. On March 15, 2006, the BLM denied the remaining three grazing applications for the same reasons. Aplt. App. 152-56, 157-62, 163-67.

2. Big Bowns Bench and Last Chance Allotments

On November 26, 2001, Canyonlands entered into an agreement with Franklin O'Driscoll, permit holder for the Last Chance allotment, whereby Mr. O'Driscoll would transfer his entire grazing preference for the Last Chance allotment to Canyonlands in exchange for compensation. Aplt. App. 841-43. Canyonlands then applied for the grazing preference and a new grazing permit for the Last Chance allotment on November 27, 2001. Aplt. App. 896-905. On November 29, 2001, Canyonlands agreed to transfer a portion of the Last Chance allotment to H. Dell LeFevre in exchange for Mr. LeFevre's entire preference in the Big Bowns Bench allotment. Aplt. App. 906-11, 890-95. Before the BLM would approve any of these transfers, Mr. O'Driscoll was required to resolve his outstanding trespass fees with the BLM. Aplee. Br. 7; Aplt. App. 516. To facilitate the transfers, Canyonlands paid Mr. O'Driscoll's trespass fees to the BLM in the amount of $3,371.20 two days prior to the approval of the transfers.

Aplt. App. 678-79.  In exchange, Canyonlands acquired all stray cattle remaining on the Last Chance allotment.  Aplt. Br. 7; Aplt. App. 440-41, 516-18.  The BLM approved the preference transfers between Canyonlands and Mr. O'Driscoll and Canyonlands and Mr. LeFevre on January 30, 2002.  Aplt. App. 891, 897, 907.

Similar to the arrangement with the BLM regarding the Clark Bench allotment, Canyonlands conditionally relinquished its grazing preference to the BLM so that the BLM could conduct an environmental assessment for the two allotments.  Stewart, 2008 WL 80252, at *3; Aplt. App. 912-1012.  Canyonlands withdrew its offers to relinquish grazing permits on the two allotments on April 15, 2002, Aplt. App. 1092-93, and the BLM acknowledged this withdrawal on May 24, 2002, Stewart, 2008 WL 80252, at *3.  The BLM issued grazing permits for the Big Bowns Bench and Last Chance allotments to Canyonlands on February 11, 2003.  Aplt. App. 1110-14.

Meanwhile, Mr. LeFevre filed a grazing application for the Big Bowns Bench allotment and a portion of the Last Chance allotment on April 1, 2002, Aplt. App. 1090-91, despite having previously transferred his interest in Big Bowns Bench to Canyonlands,  Aplt. App. 890-95.  Mr. Worth Brown and Mr. James Brown did the same.  Aplt. App. 1121-22; 1123-24.  Additionally, Mr. Wayne Phillips filed a grazing application just for the Last Chance allotment.  Aplt. App. 1094-95.  The BLM denied Mr. LeFevre's and Mr. Phillips's applications on September 26, 2003.  Aplt. App. 1131-33; 1134-36.  The BLM

denied Mr. Worth Brown's and Mr. James Brown's applications on March 15, 2006.  Aplt. App. 157-62; 163-67.

C.  The Administrative Law Judge Decision

On October 30, 2003, Mr. Stewart, Mr. LeFevre, and Mr. Phillips timely appealed the BLM's denial of their respective grazing permit applications to the Office of Hearings and Appeals within the Department of the Interior.  The Administrative Law Judge (ALJ)[1] allowed Mr. Alleman, Mr. Worth Brown, and Mr. James Brown to intervene in this formal agency adjudication, even though their permits had not yet been rejected as of the date of filing the appeal.  Aplt. App. 1328-29; Stewart, 2008 WL 80252, at *4.  The ALJ also allowed Kane and Garfield Counties to intervene.  Aplt. App. 1329.  After extensive hearings and briefing, the ALJ affirmed the BLM's denial of the grazing permits, finding that the "BLM unequivocally proved that its [final agency decisions denying the grazing permits] were each premised upon a rational, factual and legal basis." Aplt. App. 1364.

D.  Judicial Review of Agency Adjudication

Plaintiffs-Appellants, comprising all individuals and Kane and Garfield Counties, then timely petitioned for judicial review, appealing the agency's determination pursuant to the Administrative Procedure Act, 5 U.S.C.

---

[1]  The ALJ decides matters "as fully and finally as might the Secretary [of the Interior]."  43 C.F.R. § 4.1.

§ 706(2)(E).  At the outset, the district court dismissed Kane and Garfield Counties for lack of standing.  Stewart v. Norton, No. 2:06 CV 209, 2006 WL 3305409, at *6 (D. Utah Sept. 29, 2006).  The remaining plaintiffs claimed a lack of substantial evidence to support the ALJ's findings that (1) Canyonlands was qualified to hold a grazing permit; (2) Canyonlands made conditional offers to relinquish its grazing preferences; and (3) the BLM allows for conditional relinquishments.  Stewart, 2008 WL 80252, at *4.  The district court rejected all three arguments, and affirmed the decision of the ALJ.  Id. at *5-11.  The individual Plaintiffs now appeal this decision, and the Counties appeal their dismissal for lack of standing.

On appeal, Plaintiffs argue that both the ALJ and the district court incorrectly held that there are only two mandatory qualifications for becoming a valid grazing permit holder under the TGA.  As noted by the district court, the two mandatory qualifications are (1) ownership or control of base property, and (2) satisfaction of citizenship requirements or authorization to conduct business in the state in which the grazing permit is sought.  Id. at *5.  Plaintiffs maintain that the TGA additionally requires an applicant to own livestock in order to qualify for a grazing preference and to possess an intent to graze.[2]  Plaintiffs claim that,

_____

[2] Plaintiffs argue that Canyonlands's applications should have been rejected by the BLM because "Canyonlands does not own or control livestock for business purposes, is not a recognized livestock operator, is not engaged in the livestock business for profit, and never had the intent to conduct a livestock operation on any of the allotments at issue."  Aplt. Br. at 32.  Plaintiffs'

- 10 -

because Canyonlands could not satisfy either condition, it was not a qualified applicant under the TGA. Thus, they claim, the denials of the individual Plaintiffs' grazing permit applications were improper. Plaintiffs further claim that the counties were improperly dismissed for lack of standing.

## Discussion

We review a district court's decision reviewing final agency actions de novo. Citizens' Comm. to Save Our Canyons v. Krueger, 513 F.3d 1169, 1176 (10th Cir. 2008); see also 5 U.S.C. §§ 701-706. "'A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action.'" Citizens' Comm., 513 F.3d at 1176 (quoting Colo. Health Care Ass'n v. Colo. Dep't of Soc. Servs., 842 F.2d 1158, 1164 (10th Cir. 1988)). We review final agency actions "to determine whether the correct legal standards were applied and whether the factual findings are supported by substantial evidence in the record." Madrid v. Barnhart, 447 F.3d 788, 790 (10th Cir. 2006). We review all questions of law de novo. See Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d 1074, 1085 (10th Cir. 2006).

A. Requirements Under the TGA to Hold a Grazing Permit

contention that an applicant must be engaged in the livestock business and for profit is an especially hard argument to make given that this court and the Supreme Court rejected such an express and absolute requirement in Public Lands Council v. Babbitt, 167 F.3d 1287, 1305-07 (10th Cir. 1999), aff'd 529 U.S. at 745-47.

The Secretary of the Interior, guided by the text of the TGA, has the authority to establish regulations regarding the mandatory qualifications for grazing permit holders.  See Public Lands Council, 529 U.S. at 745.  The TGA itself authorizes the Secretary to issue grazing permits to "bona fide settlers, residents, and other stock owners as under his rules and regulations are entitled to participate in the use of the range . . . ."  43 U.S.C. § 315b.  The parties do not dispute that Canyonlands meets the two mandatory qualifications, as designated by the Secretary's regulations.  Aplt. Br. 19; Aplt. App. 1356; see also 43 C.F.R. § 4110.1(a) (requiring ownership or control of land or water base property); 43 C.F.R. § 4110.1(a)(1)-(3) (requiring an applicant to either meet citizenship requirements or be an entity authorized to conduct business in the state in which it is seeking a grazing permit).  Additionally, the parties agree that  "stock ownership" is an additional requirement for permit holders, as is indicated by the language of the TGA itself.  Aplee. Br. 22; Aplt. Br. 26-30.  We therefore focus on whether Canyonlands met the stock ownership requirement.

### 1.  Stock Ownership

Both the ALJ and the district court found sufficient evidence that Canyonlands owned livestock prior to obtaining a grazing permit from the BLM. We agree.  As the ALJ found, Canyonlands acquired four cattle from its agreement to pay Mr. O'Driscoll's trespass fees.  Aplt. App. 1358.  The BLM would not approve the preference transfer until Mr. O'Driscoll's trespass fees

- 12 -

were resolved. Canyonlands paid the trespass fees ($3,371.20) two days prior to the approval of the Last Chance and Big Bowns Bench allotments. Aplt. App. 516, 678-79. In exchange, Mr. O'Driscoll agreed that any of his remaining cattle would belong to Canyonlands. Id. at 516-18, 440-41. Though the agreement apparently was not in writing, the evidence suggests that the agreement was performed. Therefore, substantial evidence supports the finding that Canyonlands was in fact a "stock owner" and thus met the requirements to hold a grazing permit.

Plaintiffs contend that Canyonlands cannot claim ownership of the stray cattle because Canyonlands's transaction with Mr. O'Driscoll did not include the sale of those cattle, making the transfer merely fortuitous. Aplt. Br. 42-22. The record, however, contains sufficient evidence to support a finding that Canyonlands did own these cattle following its agreement with Mr. O'Driscoll. See Aplt. App. 677 & 679 (Mr. Hedden's testimony that Canyonlands "owned the four or five head that [it] had acquired by paying Mr. O'Driscoll's trespass fees" and that those cattle would continue to graze on the Last Chance allotment); Aplee. Supp. App. 352 (Canyonlands check request to pay Mr. O'Driscoll's trespass fees), 467 (Mr. LeFevre testifying that he branded the abandoned cattle with the Canyonlands brand).

Plaintiffs also argue, notably for the first time on appeal, that Canyonlands cannot claim ownership over the stray cattle because the transfer violates Utah

- 13 -

law because no certificate of brand inspection is in the record and estray animals are to be taken into the possession of the county after attempts to locate the true owner. Aplt. Br. 42-44 (citing Utah Code Ann. §§ 4-24-11(1); 4-25-4(1); 4-25-5(1)). The government correctly maintains that these arguments should not be considered as they were not raised below. United States v. Jarvis, 499 F.3d 1196, 1201 (10th Cir. 2007). Plaintiffs concede that the Utah statutory citations were not provided to the district court, but reply that the underlying discussion about whether the transfer was valid encompasses these theories. Aplt. Reply Br. 12-13. The record citations provided by the Plaintiffs admit of no specific claims like these and we decline to consider them.

The government also argues that in the event Canyonlands did not own livestock, it was a "stock owner" because it was a start-up grazing operation. We need not address this issue because substantial evidence supports the finding that Canyonlands did own livestock prior to receiving grazing permits from the BLM.

2. Intent to Graze

Plaintiffs next argue that a permit holder under the TGA must possess an intent to graze, which they claim Canyonlands did not possess. Aplt. Br. 30, 32-33. Plaintiffs suggest that the Secretary "has a clear duty to consider the applicant's 'intent to graze' as a qualification to acquire the grazing preference."

Aplt. Br. 30.[3]  However, like the ALJ and district court, we find no direct requirement, either in the text of the TGA or in the implementing regulations set forth by the Secretary, that the BLM engage in such a complicated inquiry.  Only after the permit is granted does the BLM's duty arise to ensure that the property is used for grazing.  See 43 C.F.R. §§ 4140.1(a)(2), 4170.1-2 (authorizing the BLM to assess penalties or cancel active use if a permittee has failed to make substantial use of the property under a grazing permit for two consecutive years).  As argued by the government, it would be untenable to have the BLM engage in a subjective inquiry of every permit applicant's specific intent to graze, when the entire purpose of requesting an application is for the grazing of livestock.  See Aplee. Br. 35-36; see also Public Lands Council, 167 F.3d at 1307-08.  The BLM found that Canyonlands met the requirements necessary for a grazing permit; the decision is supported by substantial evidence, and we need not go any further.

B.  The Standing of Kane and Garfield Counties

Plaintiffs also appeal the district court's determination that Kane and Garfield Counties lack standing.  Although we have held that intervenors need not establish standing in their own right provided they are aligned with another party

---

[3]  Plaintiffs sole support for this assertion is this court's statement in Public Lands Council, where we stated that "[t]he Secretary's assertion that 'grazing permits' for use of land in 'grazing districts' need not involve an intent to graze is simply untenable."  167 F.3d at 1308.  That statement, however, was in regard to the Secretary's attempt to issue grazing permits for conservation use, and never announced a requirement that the Secretary make a finding of an intent to graze prior to issuing a grazing permit.

with constitutional standing, see San Juan County, Utah v. United States, 503 F.3d 1163, 1171-72 (10th Cir. 2007) (en banc), the Counties were named plaintiffs, not intervenors, and their claims must confer standing, see Aplt. App. 81, ¶¶ 34-36.  Article III requires a plaintiff to establish three elements: (1) injury in fact, (2) causation, and (3) redressibility.  ACLU of N.M. v. Santillanes, 546 F.3d 1313, 1317-18 (10th Cir. 2008).  A plaintiff must first demonstrate "'an injury in fact,' defined as the 'invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" Id. at 1318 ( quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted).  A plaintiff must next demonstrate a "'causal connection between the injury and the conduct.'" Id. (quoting Lujan, 504 U.S. at 560).  Finally, "a plaintiff must demonstrate that it must be 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" Id. (quoting Lujan, 504 U.S. at 561).  We review issues of standing de novo.  Id. (quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)).

As to the injury requirement, Kane and Garfield Counties argue that they have a proprietary interest that is harmed by the BLM's grant of grazing permits to Canyonlands.  The Counties argue that they will suffer financially from a decline in the range-fed cattle industry, and that the BLM's issuance of grazing permits to Canyonlands "effectively eliminate[s] livestock grazing" in the area.

Aplt. Br. 50. In making this argument, the Counties suggest that a decrease in livestock grazing decreases the tax revenues generated through sales and property taxes, thus injuring the Counties. Aplt. Br. 49-50. The Counties further argue that a decrease in livestock grazing injures the aesthetic appeal of the Counties and will hamper their ability to provide for the health, safety, and welfare of their citizens. Aplt. Br. 52-53; Aplt. App. 33-35, ¶¶ 37-44.

We find no direct injury to the Counties resulting from the mere issuance of grazing permits to Canyonlands. The Counties ask us to assume that the issuance of the permits will, without question, decrease tax revenues because Canyonlands has no intention to graze the land. They also ask us to assume further that this decrease in grazing, which seems purely speculative, will negatively impact the aesthetic appeal of the counties. We cannot make such assumptions, and therefore, the injury argument at this stage is merely conjectural or hypothetical.

Even if the Counties could establish a cognizable injury, they must next demonstrate that the injury is "fairly traceable to the challenged action of the defendant," thus satisfying the causation element of standing. Friends of the Earth v. Laidlaw Envtl. Servs., 528 U.S. 167, 180 (2000). The Counties, however, are unable to demonstrate that the BLM's action leads directly to the elimination of grazing in the areas at issue. The Counties argue that their asserted financial injury is fairly traceable to the BLM's actions because the BLM, in its "unlawful collaboration" with Canyonlands, allowed the issuance of a grazing

permit to an entity with no intent to graze livestock. Aplt. Br. 54-55. As we have addressed above, the BLM was not required to inquire into Canyonlands subjective intent. Any assertion, therefore, that the BLM intentionally issued a permit to an entity that had no intention of grazing is irrelevant.

The Counties have not demonstrated any direct link between decreased tax revenues due to a decrease in grazing and the issuance of grazing permits to Canyonlands. Finding that there is no concrete injury or that any asserted injury is caused by an action of the BLM, there is no need to reach the issue of redressibility. The district court properly dismissed the Counties for lack of standing.

AFFIRMED.